*This opinion will be unpublished and
may not be cited except as provided by
Minn. Stat. § 480A.08, subd. 3 (2012).*

**STATE OF MINNESOTA
IN COURT OF APPEALS
A14-0660**

In re: Estate of James G. Lindell, Deceased

**Filed December 29, 2014
Affirmed
Hooten, Judge**

Washington County District Court
File No. 82-PR-11-5383

Joseph F. Schmidt, Minneapolis, Minnesota (for appellant Nancy Lindell)

Andrew M. Baese, Benjamin E. Gurstelle, Diane B. Bratvold, Briggs and Morgan, P.A., Minneapolis, Minnesota (for respondents James Lindell, Jr., Marty Lindell, and U.S. Bank National Association)

Considered and decided by Rodenberg, Presiding Judge; Hooten, Judge; and Kirk, Judge.

**U N P U B L I S H E D   O P I N I O N**

**HOOTEN**, Judge

In this probate appeal, appellant challenges the district court's summary-judgment denial of her objection to the probate of decedent's will, arguing that the district court erred in determining that decedent's house was no longer his homestead at the time of his death. We affirm.

# FACTS

The material facts in this case are undisputed. James G. Lindell, Sr. (decedent) died on August 25, 2011. Respondents James G. Lindell, Jr., Marty J. Lindell, and U.S. Bank are decedent's duly appointed personal representatives. James G. Lindell, Jr. and Marty J. Lindell are decedent's sons. Appellant Nancy J. Lindell is decedent's former daughter-in-law, who objected to the probate of decedent's will, claiming that decedent's real property in Woodbury, Minnesota (the Woodbury house) was his homestead at the time of his death. The Woodbury house was jointly owned by decedent and his wife, Jean Lindell, who predeceased him.

Decedent's will, as amended by three codicils, directs respondents to make certain devises and then distribute the residue of the estate equally between a marital trust and a family trust created under the will. The will provides:

> I devise to the trustees of the [marital trust] . . . *any interest that I may own at my death . . . in any homestead real estate* . . . . If my wife, Jean, does not survive me, then I devise any interest described in the preceding sentence to the trustees of the [family trust] . . . .

(Emphasis added). This devise would be applicable only if decedent owned an interest in "homestead real estate" at the time of his death. If the Woodbury house was decedent's homestead at the time of his death, his interest in it would be transferred to the family trust, from which appellant would receive $200,000. If the property was not decedent's homestead when he died, his interest in it would pass under decedent's will, under which appellant would receive nothing.

2

Upon her death, Jean Lindell's ownership interest in the Woodbury house was transferred to the marital trust. Jean Lindell's will provided that decedent had the right to live in and use the Woodbury house for as long as he desired. In addition, the will stated that the trustees of the marital trust "shall sell the trust's interest in any [homestead] real estate" at the direction of decedent.

Decedent planned and explicitly directed that, when he was no longer able to make decisions for himself, his agents and attorneys-in-fact would make those decisions for him. James G. Lindell, Jr., Marty J. Lindell, and Patrick M. Farley were appointed by decedent as his attorneys-in-fact pursuant to a statutory short form power of attorney executed in 2001. The power of attorney granted the attorneys-in-fact all the statutory powers and stated that it would "continue to be effective if [decedent became] incapacitated or incompetent." Further, by a durable power of attorney for health care executed in 2003, decedent appointed his son, James G. Lindell, Jr., as his agent to make any health-care decisions for decedent at such time decedent was unable to make or communicate his own decisions.

Decedent suffered from Alzheimer's disease for several years before his death. Because of decedent's condition, his family held regular meetings concerning his care and well-being. As early as 2004, the family discussed "alternative living arrangement opportunities for [decedent], if he ever decide[d] to move from his home." For a number of years after his diagnosis, decedent was able to stay in the Woodbury house with the assistance of a combination of professional health-care workers and non-professional companions, including appellant, who was employed to care for decedent two days per

3

week. By 2005, as decedent's condition declined, he ultimately needed 24-hour supervision. Due to his disease, decedent became unable to recognize his family members and no longer knew where he was.

In 2008, decedent's treating physician concluded that, as a result of chronic and irreversible dementia, decedent required "others to make economic and health care decisions on his behalf." This letter triggered the health-care power of attorney and gave James G. Lindell, Jr. the authority to make health-care decisions for decedent, including whether to permanently move decedent from the Woodbury house.

Eventually, living at home was no longer an option for decedent because he needed more care than his in-home caregivers could provide. Because of his deteriorated mental and physical state, decedent's children finally decided, on July 18, 2011, to evaluate several skilled nursing facilities at which decedent would reside going forward. The family collectively decided that it was "the right time" to explore moving decedent to a nursing facility so he could receive around-the-clock care. By this time, decedent's daughter was living with him in the Woodbury house.

After extensive searching, decedent's attorneys-in-fact applied for residency for decedent at Prelude Homes Memory Care Cottages (Prelude Homes) by signing a reservation agreement and paying a reservation deposit on August 9, 2011. At the family meeting on that date, the family discussed the transition and the attributes of Prelude Homes, as well as discharging the care providers at the Woodbury house, including appellant. The family also "discussed changing the locks on the house after [decedent] le[ft]." Decedent's daughter indicated that she would move out of the Woodbury house

4

when decedent left and that she would periodically check on the house until it sold. The family agreed that its attorney would draft a letter directing that the Woodbury house would be immediately listed for sale with a realtor and that decedent's attorneys-in-fact, who had the power to enter into real-estate transactions on behalf of decedent, would sign the letter. The family also discussed removing all tangible personal property from the Woodbury house in connection with readying it for sale.

James G. Lindell, Jr. and Marty J. Lindell moved their father to Prelude Homes on August 15, 2011. Because decedent's deteriorating condition required the around-the-clock care afforded to him at Prelude Homes, decedent's attorneys-in-fact had no intention of returning decedent to the Woodbury house. In an August 16, 2011 letter, James G. Lindell, Jr. and Marty J. Lindell notified the trustees of the marital trust that decedent would "no longer be residing at [the Woodbury house]" and directed the trustees to sell the trust's interest in the Woodbury house. The letter further stated that "[a]s attorneys-in-fact, we intend to sell [decedent's] interest in the real estate. We recommend that the property be listed for sale as soon as possible, and that a listing agreement be signed by the trustees . . . as well as ourselves as attorneys-in-fact for [decedent]."

Shortly thereafter, the Woodbury house was marketed for sale. While decedent was residing at Prelude Homes and after the sale of the Woodbury house had been put in motion, decedent died on August 25, 2011. No homestead notice was ever filed for the Woodbury house after decedent moved out. The Woodbury house remained unoccupied until it was eventually sold after decedent's death.

5

Based on these uncontested facts, the parties filed cross-motions for summary judgment, arguing that whether the Woodbury house was decedent's homestead at the time of his death was a question of law. In March 2014, the district court issued an order, concluding that the Woodbury house was not decedent's homestead at the time of his death because he ceased to occupy the house and had no intention to return once he moved to Prelude Homes. Accordingly, the district court granted respondents' motion and denied appellant's motion. This appeal followed.

## DECISION

Appellant argues that the district court committed reversible error by granting respondents' motion for summary judgment because decedent had not abandoned the Woodbury house by the time of his death.

Summary judgment is proper if "there is no genuine issue as to any material fact and . . . either party is entitled to a judgment as a matter of law." Minn. R. Civ. P. 56.03. Whether a homestead has been abandoned is generally a mixed question of law and fact. *In re Estate of Riggle*, 654 N.W.2d 710, 714 (Minn. App. 2002). However, "[w]here, as here, there were cross-motions for summary judgment by the parties and both parties agree that there are no genuine issues of material fact, we review the district court's application of the law de novo." *MidCountry Bank v. Krueger*, 782 N.W.2d 238, 244 (Minn. 2010).

"[C]ourts read debtor-creditor statutes pertaining to homesteads to fill in the relevant gaps in the probate statutes." *In re Estate of Eckley*, 780 N.W.2d 407, 410 (Minn. App. 2010). Under Minnesota law, a homestead is "[t]he house owned and

6

occupied by a debtor as the debtor's dwelling place, together with the land upon which it is situated." Minn. Stat. § 510.01 (2012). "Property ceases to be the owner's homestead when the owner abandons his home." *Eckley*, 780 N.W.2d at 410 (discussing Minn. Stat. § 510.07 (2008)).[1]

Under the common law, "abandonment of a homestead has two basic components: cessation of occupancy and lack of an intent to return." *Riggle*, 654 N.W.2d at 714–15; *see also In re Hickman*, 222 Minn. 161, 168, 23 N.W.2d 593, 597 (1946) ("Abandonment of a homestead results when the owner removes therefrom and ceases to occupy the same, with the intention of never returning or with no intention of returning thereto to reside." (emphasis omitted) (quotation omitted)). Abandonment of a homestead must be proven by clear and convincing evidence. *Id.* at 715.

An owner ceases to occupy his homestead if he no longer actually and continuously occupies the property. *See Clark v. Dewey*, 71 Minn. 108, 110, 73 N.W. 639, 640 (1898) ("[T]here must be actual and continued occupation of and residence upon the premises in order to constitute a homestead . . . ."). "Of course, the term 'actual occupancy' must receive a reasonable construction, and is not to be understood as requiring constant personal presence, so . . . that a temporary absence . . . would constitute . . . an abandonment." *Id.*

At the direction of decedent's attorneys-in-fact and health-care agent, decedent moved into Prelude Homes on August 15, 2011. Pursuant to a durable power of attorney

---

[1] The language from Minn. Stat. § 510.07 (2012) that is relevant to the present case is unchanged since 2008.

for health care, decedent's health-care agent, respondent James G. Lindell, Jr., had the authority "to make health care decisions on behalf of" decedent, including the authority to establish decedent's abode to meet his health-care needs. Minn. Stat. § 145C.01, subd. 4 (2012). The decision to move decedent to Prelude Homes was carefully thought out and planned by decedent's family, and his attorneys-in-fact and health-care agent intended the move to be permanent. This is not the type of "temporary absence" Justice Mitchell warned of in *Clark*, when he observed that "the term 'actual occupancy' . . . is not to be understood as requiring constant personal presence, so as to make a man's residence his prison." 71 Minn. at 110, 73 N.W. at 640. Here, as of August 15, 2011, decedent no longer occupied or resided at the Woodbury house, and there was no evidence that his absence from the house was temporary. On these undisputed facts, there is clear and convincing evidence that, prior to his death on August 25, 2011, decedent ceased to occupy the property.

Whether decedent lacked intent to return to the Woodbury house when he ceased occupation is a more difficult question. Intent is determined by looking to conduct in addition to stated intentions. *Riggle*, 654 N.W.2d at 715. Factors to consider include whether the owner had established another residence and whether other occupants, such as a surviving spouse, continued to reside at the property. *See id.* Intent to abandon a homestead need not be an *active* intent *not* to return; instead, the owner must cease occupancy "with the intention of never returning *or* with no intention of returning." *Hickman*, 222 Minn. at 168, 23 N.W.2d at 597 (emphasis omitted).

8

Because decedent suffered from Alzheimer's disease, he was incapable of forming intent to return to the Woodbury house after he relocated to Prelude Homes. In a limited sense, this shows that decedent "lack[ed] . . . an intent to return." *Riggle*, 654 N.W.2d at 715. However, by itself, this negative proof does not establish *by clear and convincing evidence* that decedent lacked intent to return.

Appellant argues that, under these circumstances, neither decedent nor his attorneys-in-fact could make decisions regarding the abandonment of the Woodbury house. But, in 2001, decedent executed a statutory short form durable power of attorney, under which "[a]ny action taken by the attorney[s]-in-fact pursuant to the power of attorney binds the principal . . . in the same manner as though the action was taken by the principal." Minn. Stat. § 523.12 (2012). Decedent's intent may be determined by looking to his conduct, *Riggle*, 654 N.W.2d at 715, and under section 523.12, decedent's execution of a durable power of attorney indicated his intention that he was to be bound by the conduct of his attorneys-in-fact.

On August 9, 2011, the attorneys-in-fact applied for residency for decedent at Prelude Homes by signing a reservation agreement and paying a reservation deposit. After decedent moved to Prelude Homes, the attorneys-in-fact directed that the Woodbury house should be immediately listed with a realtor and sold. Under the durable power of attorney, the attorneys-in-fact had the authority to "dispose of . . . any estate or interest in real property." Minn. Stat. § 523.24, subd. 1(2) (2012). In a letter dated August 16, 2011, the attorneys-in-fact notified the trustees of the marital trust that decedent would "no longer be residing" at the Woodbury house and directed the trustees

9

to sell the trust's interest in the Woodbury house. The letter also stated that the attorneys-in-fact intended to sell decedent's interest in the Woodbury house and recommended that the property be listed for sale as soon as possible. Finally, after decedent moved to Prelude Homes, his family discussed changing the locks of the Woodbury house, removing all tangible personal property from it, and having decedent's daughter move out of the Woodbury house. On this record, the actions taken by the attorneys-in-fact demonstrate by clear and convincing evidence that decedent lacked intent to return to the Woodbury house.

In rejecting appellant's argument that decedent cannot be bound by the conduct of the attorneys-in-fact, the district court explained,

> [Appellant's] position is really distilled to her claim that an attorney-in-fact cannot, as a matter of law, make decisions which result in the abandonment of the principal's homestead. . . . It is unclear[, however,] how an attorney-in-fact can have the authority to dispose of *any interest* in real property, but not have the authority to retain that property and abandon its homestead status.

We agree with the district court's reasoning. Abandoning a property's homestead status is less drastic than disposing of the property and would be a prerequisite to conveying homestead property to certain third parties. Because the attorneys-in-fact had the authority to "dispose of . . . any estate or interest in real property," *id.*, it is illogical to conclude, as a matter of law, that the attorneys-in-fact lacked the authority to abandon the homestead status of decedent's property.

Appellant argues that decedent did not abandon his homestead, citing Minn. Stat. § 510.07 (2012) and *Eckley*. Under section 510.07, "[a] homestead is deemed abandoned

10

if the owner does not occupy it for more than six consecutive months and the owner does not file notice with the county recorder claiming it as his homestead," even if the owner intends to return. *See Eckley*, 780 N.W.2d at 410 (citing Minn. Stat. § 510.07 (2008)). However, if the owner is mentally incapacitated to the point of being under a legal disability, he is not required to file notice in order to maintain the homestead status of his property in the event of an absence longer than six months. *Id.*

These two rules for abandonment of a homestead—the common-law rule and the rule from section 510.07—are distinct:

> While *abandonment of a homestead is ordinarily a question of actual cessation of occupancy plus intent*, we have held . . . that the addition [by] the legislature of the 6-month vacancy rule means that the homestead exemption is lost after 6 months unless the person has filed [notice], no matter what the person's intention.

*Muscala v. Wirtjes*, 310 N.W.2d 696, 698 (Minn. 1981) (emphasis added); *see also Kramer v. Lamb*, 84 Minn. 468, 469–70, 87 N.W. 1024, 1025 (1901) (discussing the interaction between these two rules). Thus, the requirements for maintaining the homestead exemption under section 510.07 are inapplicable where the owner, under the common law, has abandoned the property. *See Muscala*, 310 N.W.2d at 698. In any event, the notice requirement under section 510.07 is relevant only where the owner has ceased to occupy his homestead for longer than six months and intends to return to the property. *See Ries v. Thiesse*, 61 F.3d 631, 632 n.1 (8th Cir. 1995) (directing the bankruptcy court to apply Minnesota's common-law abandonment rule because the debtor had ceased to occupy her homestead for less than six months). Because decedent

11

abandoned the Woodbury house under the common-law rule, section 510.07 was never triggered.

Appellant's reliance upon *Eckley* is also misplaced. In *Eckley*, the decedent was absent from his home for over six months and never filed a homestead notice, but he was under a legal disability due to mental incapacity. *See* 780 N.W.2d at 409. Moreover, by every indication, the decedent intended to return to his home so he could join his new wife once her immigration problems were resolved. *See id.* at 409–12. This court thus held that the decedent did not abandon his homestead pursuant to the legal-disability exception to section 510.07. *Id.* at 412.

This case is distinguishable from *Eckley*. Here, at the time of decedent's death only ten days after he left the Woodbury house and moved into Prelude Homes, there was clear and convincing evidence that he ceased to occupy the property and lacked intent to return.

Because there was clear and convincing evidence that decedent abandoned the Woodbury house as his homestead, and he therefore did not own any interest in any homestead real estate at the time of his death, the district court did not err in concluding that respondents were entitled to judgment as a matter of law.

**Affirmed.**